COLE, Judge.
This is a contractual dispute over funds allegedly owed to plaintiff as a subcontractor on a construction project in Baton Rouge, Louisiana.
On August 25, 1972, Re-Steel, Inc., entered into a written contract with Haas and Haynie-Tudor Construction Company (hereafter, “HHT”), which was the general contractor for the construction of a bank building known as “One American Place.” That contract provided that the plaintiff was to provide and install the necessary reinforcing steel for the job.
In December, 1973, disagreements between the project owner, Cabot, Cabot and Forbes (hereafter, “CCF”), and HHT arose, which caused considerable doubt as to whether HHT was going to complete the job as the general contractor. Mac R. Lambert, the president of Re-Steel, Inc., was so informed and discussed its status at that time with Kenneth R. Kay, the project manager for HHT. On or about December 20, 1973, at Kay’s suggestion, Lambert discussed Re-Steel’s continuation on the job with William Purcell, the project manager for HHT’s apparent successor, Linbeck Construction Corporation. An oral agreement was thereafter reached between those two under which the plaintiff, which had been previously losing money on the job, agreed to continue. On January 7, 1974, Re-Steel Was notified that HHT would remain as the general contractor, and on the following day, plaintiff voluntarily left the job.
This litigation followed with suits being brought by Re-Steel against the owner, general contractor and Linbeck. The latter was subsequently dismissed and the matter tried as to the remaining defendants. Judgment was thereafter rendered in favor of the plaintiff in the amount of $13,713 against HHT only. Only the plaintiff has appealed.
Re-Steel contends that it is owed $96,-576.83, or, alternatively, $139,615.27, because there was a unilateral cancellation of the contract by HHT and that the terms of Article XXXII relating to such a cancellation should be applied. That article provides:
“The Contractor may terminate the employment of the Subcontractor at any time, even though the Subcontractor is not in default. In such event, the Contractor shall pay to, or for the account of the Subcontractor, on account of the Work performed prior to the effective date of such termination (1) all actual costs approved by the Contractor as having been paid or incurred by the Subcontractor in connection with performance of the Work; (2) all costs incurred with the Contractor’s prior written approval in settling or discharging outstanding commitments entered into, in good faith, by the Subcontractor in connection with performance of the work; (3) a reasonable amount to cover general overhead expenses of the Subcontractor incurred in connection with the performance of the Work and which are not covered by payments under Items (1) and (2) above; and (4) an amount equal to — of the total of Items (1), (2) and (3) above in lieu of all profits which the Subcontractor would or might have realized if this Contract had been completely performed; provided that the workmanship, materials and equipment for which payment is to be made as aforesaid are in accordance with the requirements of this Contract. There shall be deducted from the amount determined above all payments previously made by the Contractor and all amounts which the Contractor is entitled to charge *698 the Subcontractor under this Contract. In no event shall the amount to be paid to, or for the account of, the Subcontractor pursuant to this Article XXXII plus all amounts previously paid the Subcontractor plus all amounts which the Contractor is entitled to charge the Subcontractor under this Contract exceed the Contract Price, as adjusted.
“The Subcontractor shall (a) assign and transfer to the Contractor, as directed by the Contractor, all materials, equipment, tools, plant and facilities for which payment has or will be made under this Contract and all subcontracts, orders and commitments and shall execute and deliver all such papers and take all such action as the Contractor may require to fully vest in the Contractor the rights of the Subcontractor in and to the same; (b) cancel, as directed by the Contractor, subcontracts, orders and commitments; and (c) sell at prices approved by the Contractor such materials, equipment, tools, plant and facilities as the Contractor shall direct, the proceeds to be paid or credited to the Contractor as the Contractor shall direct.
“The Subcontractor shall furnish the Contractor with detailed and correct records and copies of all subcontracts, orders, commitments, costs, accounts and statements. Furthermore, in order that the interests of the Contractor may be properly protected, the Subcontractor shall fully insure, at the cost of the Contractor, such materials, equipment, tools, plant and facilities as may be involved hereunder with insurance in favor of the Contractor against fire and/or theft, and if so required, shall furnish the Contractor with certificates for such insurance.” (Exhibit P-1)
In the further alternative, they seek damages from these defendants because they allegedly caused Linbeck to breach its agreement with the appellant.
The trial judge concluded that the contract between Re-Steel and HHT was can-celled by mutual consent and although Re-Steel had a later agreement with Linbeck, that Re-Steel itself abandoned that agreement, and that no proof was produced that the owner or general contractor caused Re-Steel to lose the Linbeck contract. Although our findings vary from those of the trial court to some extent, the result of its decision will not be affected.
We conclude that there was no mutual cancellation of the contract between Re-Steel and HHT. Although Lambert testified that he believed that the contract had been terminated by his discussion with Kay, the latter testified that he made no such representations to Lambert, nor did he have the authority to do so. William Purcell also stated that it was not clear at that point in time that Re-Steel had been released by HHT.
Additionally, although Article XXXII does not specifically state that a unilateral termination would have to be in writing, the tenor of the agreement strongly supports that conclusion. Article XXXIV contains these terms:
“This Contract constitutes the entire agreement between the parties hereto and cannot be amended, modified or changed except as herein provided; nor can the provisions of this Contract be waived except by an express waiver in writing.” (Exhibit P-1)
Articles VIII and XXI contain similar requirements. Therefore, the provisions of Article XXXII are not applicable here, as the agreement was never unilaterally terminated by HHT.
While still so obligated, Lambert negotiated with Linbeck with the expectation of staying on the job for that contractor. Purcell related that in late December, 1973, many uncertainties existed as to the various responsibilities on the project; but, in the interest of keeping the work moving during the prospective transition, they agreed with Lambert to see to it that he did not lose more money if he would continue until the details were worked out. Acting for Re-Steel, Lambert agreed to do this and did so until notified that HHT was to remain as the general contractor under Linbeck’s su *699 pervision, at which time Re-Steel elected to cease working on the project, thereby passively violating its contract with HHT. LSA-C.C. art. 1931.
That this was a tentative, interim arrangement was known and made clear to Lambert by Purcell. Plaintiff’s answer to Interrogatory No. 3-a propounded by Lin-beek, which is entered here as Defendant’s Exhibit-4, is the following:
“a.) On December 24, 1973, a tentative verbal agreement was made but all the terms were not finalized until January 3, 1974.”
Linbeck’s arrangement with Re-Steel thereafter terminated when HHT began to continue again in the capacity of general contractor.
With respect to appellant’s demand based upon appellee’s alleged inducement of a breach of contract between Linbeck and appellant, our law does not recognize a cause of action therefor. Roussel Pump & Electric Company v. Sanderson, 216 So.2d 650 (La.App. 4th Cir. 1968); Delta Finance Company of Louisiana v. Graves, 180 So.2d 85 (La.App. 2nd Cir. 1965); New Orleans Opera Guild v. Local 174, Musicians M. P. U., 242 La. 134, 134 So.2d 901 (1961); Templeton v. Interstate Electric Company, 214 La. 334, 37 So.2d 809 (1948); Cust v. Item Company, 200 La. 515, 8 So.2d 361 (1942).
The appellee admits that the amount' awarded by the trial judge is correct and has deposited those funds into the registry of the court. The judgment will, therefore, be affirmed, at appellant’s costs.
AFFIRMED.